# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MABEY BRIDGE & SHORE, INC.,  :
          :
    Plaintiff     :  No. 1:10-CV-1474
           :
    v.       :  Judge Rambo
           :
ALLEN D. BIEHLER, Secretary :
of Transportation of the   :
Commonwealth of Pennsylvania, :
           :
    Defendant   :
           :

## M E M O R A N D U M

Before the court is Defendant Allen D. Biehler's, Secretary of Transportation of the Commonwealth of Pennsylvania ("PennDOT"), motion for summary judgment, (Doc. 11), pursuant to Federal Rule of Civil Procedure 56. The motion has been fully briefed and is ripe for disposition.

## I.  Background[1]

### A. Pennsylvania Steel Act and Buy America Act

On March 3, 1978, Pennsylvania enacted the Steel Products Procurement Act ("Steel Act"), 73 Pa. Cons. Stat. § 1881, *et seq.*[2] (Def.'s Statement of Material Facts, ¶ 1; Pl.'s Statement of Material Facts, ¶ 1.) The Steel Act was designed to be within the police powers of the state of Pennsylvania and was formed to "protect the health, safety and general welfare of the citizens of the

---

[1] The following facts are not in dispute, except where indicated.

[2] This fact is "disputed" to the extent that Plaintiff's argue the Steel Act has recently been reinterpreted and reapplied in recent months thereby effectively creating a current change in law. The court finds that this is more appropriately addressed as a legal argument in the discussion Section III, Subpart C, *infra.*

Commonwealth." 73 Pa. Cons. Stat. § 1882. The General Assembly, in enacting the Steel Act, determined that Pennsylvania was one of the leading states in the production of steel, as such, the Steel Act would promote the general welfare and stimulate the economies of both Pennsylvania and the United States. *See* 73 Pa. Cons. Stat. § 1883. Furthermore, the Steel Act is designed to be remedial in nature, and each provision is to be liberally construed to best promote the general welfare and stimulate the economy. 73 Pa. Cons. Stat. § 1887.

Specifically, the Steel Act requires that

Every public agency shall require that every contract document for the construction, reconstruction, alteration, repair, improvement or maintenance of public works contain a provision that, if any steel products are to be used or supplied in the performance of the contract, only steel products as herein defined shall be used or supplied in the performance of the contract or any subcontracts thereunder.

73 Pa. Cons. Stat. § 1884(a). The parties agree that the Pennsylvania Department of Transportation ("PennDOT") is a "public agency" as defined by the Steel Act. (Def.' Statement of Material Facts, ¶ 6.)

The Steel Act defines "public works" as:

Any structure, building, highway, waterway, street, bridge, transit system, airport or other betterment, work or improvement whether of a *permanent or temporary nature* and whether for governmental or proprietary use. The term includes, but is not limited to, any railway, street railway, subway, elevated and monorail passenger or passenger and rail rolling stock, self-propelled cars, gallery cars, locomotives, passenger buses, wires, poles and equipment for electrification of a transit system, rails, tracks, roadbeds, guideways, elevated structures, buildings, stations, terminals, docks, shelters and repairs to any of the foregoing.

73 Pa. Cons. Stat. § 1886 (emphasis added).

"Steel products" is defined as "[p]roducts rolled, formed, shaped, drawn, extruded, forged, cast, fabricated or otherwise similarly processed, or processed by a combination of two or more of such operations, from steel made in the United States . . . ." 73 Pa. Const. Stat. § 1886.

In addition to the Steel Act, the United States Congress has passed the Buy American Act, 23 U.S.C. 313 *et seq.* (the "BAA"), which provides:

> **(a)** Notwithstanding any other provision of law, the Secretary of Transportation shall not obligate any funds authorized to be appropriated to carry out the Surface Transportation Assistance Act of 1982 (96 Stat. 2097) or this title and administered by the Department of Transportation, unless steel, iron, and manufactured products used in such project are produced in the United States.
> **(b)** The provisions of subsection (a) of this section shall not apply where the Secretary finds--
>    **(1)** that their application would be inconsistent with the public interest;
>    **(2)** that such materials and products are not produced in the United States in sufficient and reasonably available quantities and of a satisfactory quality; or
>    **(3)** that inclusion of domestic material will increase the cost of the overall project contract by more than 25 percent.
>
> **(d)** The Secretary of Transportation shall not impose any limitation or condition on assistance provided under the Surface Transportation Assistance Act of 1982 (96 Stat. 2097) or this title that restricts any State from imposing more stringent requirements than this section on the use of articles, materials, and supplies mined, produced, or manufactured in foreign countries in projects carried out with such assistance or restricts any recipient of such assistance from complying with such State imposed requirements.

23 U.S.C. § 313(a)(b) & (d).

The United State Code of Federal Regulations has two sections relevant to this case which attempt to clarify both the requirements and the restrictions imposed on steel products by the BAA. Section 635.409 states:

3

*No requirement shall be imposed and no procedure shall be enforced by any State transportation department in connection with a project which may operate:*

1)(a) To require the use of or provide a price differential in favor of articles or materials produced within the State, or otherwise to prohibit, restrict or discriminate against the use of articles or materials shipped from or prepared, made or produced in any State, territory or possession of the United States; or

*(b) To prohibit, restrict or otherwise discriminate against the use of articles or materials of foreign origin to any greater extent than is permissible under policies of the Department of Transportation as evidenced by requirements and procedures prescribed by the FHWA Administrator to carry out such policies.*

23 C.F.R. § 635.409 (emphasis added).

In addition, Section 635.410, states, in relevant part:

(a) The provisions of this section shall prevail and be given precedence over any requirements of this subpart which are contrary to this section. However, *nothing in this section shall be construed to be contrary to the requirements of § 635.409(a) of this subpart.*

(b) No Federal-aid highway construction project is to be authorized for advertisement or otherwise authorized to proceed unless at least one of the following requirements is met:

*(1) The project either: (i) Includes no permanently incorporated steel or iron materials*, or (ii) if steel or iron materials are to be used, all manufacturing processes, including application of a coating, for these materials must occur in the United States. Coating includes all processes which protect or enhance the value of the material to which the coating is applied.

*(2) The State has standard contract provisions that require the use of domestic materials and products, including steel and iron materials, to the same or greater extent as the*

4

*provisions set forth in this section.*

(3) The State elects to include alternate bid provisions for foreign and domestic steel and iron materials which comply with the following requirements. Any procedure for obtaining alternate bids based on furnishing foreign steel and iron materials which is acceptable to the Division Administrator may be used. The contract provisions must (i) require all bidders to submit a bid based on furnishing domestic steel and iron materials, and (ii) clearly state that the contract will be awarded to the bidder who submits the lowest total bid based on furnishing domestic steel and iron materials unless such total bid exceeds the lowest total bid based on furnishing foreign steel and iron materials by more than 25 percent.

(4) When steel and iron materials are used in a project, the requirements of this section do not prevent a minimal use of foreign steel and iron materials, if the cost of such materials used does not exceed one-tenth of one percent (0.1 percent) of the total contract cost or $2,500, whichever is greater. For purposes of this paragraph, the cost is that shown to be the value of the steel and iron products as they are delivered to the project.

23 C.F.R. § 635.410 (a)-(b) (emphasis added).

The Federal Highway Administration ("FHWA") has released the following relevant statements with regard to the BAA's steel requirements.

The FHWA's policy for Buy America provides for: a domestic manufacturing process for any steel or iron products (including protective coatings) that are permanently incorporated in a Federal-aid highway contract . . . .

*- U.S. Dep't of Transp., FHWA, Construction Program Guide, Buy America, Pl.'s Ex. 14.)*

Materials must be permanently installed, not temporary. Temporary materials may be left in place at the contractor's convenience.

*- U.S. Dep't of Transp., FHWA, Quick Facts About "Buy America" Requirements for Federal-aid Highway Construction, 23 CFR 635.410, Pl.'s Ex. 15.)*

For the Buy America requirements to apply, the steel or iron product must be permanently incorporated into the project. Buy America does not apply to temporary steel items, e.g., temporary sheet piling, *temporary bridges*, steel scaffolding and falsework, etc. Further, Buy America does not apply to materials which remain in place at the contractors convenience.

. . .

Buy America provisions apply to all steel and iron materials that is to be permanently incorporated in a Federal-aide project, even if that item is rendered as a "donated material". . . .

. . .

State Restrictions: States may have "Buy America" provisions that are *more restrictive* than the Federal requirements, including provisions for products that are not covered by Buy America, such as crumb rubber, glass, plastic, and aluminum. However, the more restrictive provisions must be required by State law. If more restrictive requirements are imposed as a matter of State policy, directive or regulation, the FHWA requires a State legal opinion that the requirements are authorized under State law and do not conflict with the competitive bidding statutes of the State. The State law or policy may not establish an in-State materials preference.

*-FHWA, Off. of Infrastructure, Off. of Program Admin., Contract Admin. Grp. (HIPA-30), Contract Admin. Core Curriculum Participant's Manual and Reference Guide 2006, Pl.'s Ex. 13.)* (emphasis added).

## B.    Mabey Bridge and Shore, Inc.

Mabey Bridge and Shore, Inc. ("Mabey"), is a Delaware corporation with a principle place of business in Maryland, but with various locations throughout the United States, including a staff of fourteen employees in Pennsylvania. (Pl.'s Statement of Material Facts ("SMF"), ¶¶ 1-4.) For over twenty years, Mabey has provided temporary bridges to contractors in Pennsylvania, including PennDOT. (*Id.* ¶ 22.) Mabey's bridges are constructed of British steel. (*Id.* ¶ 7.) Over the years, Mabey has provided approximately fifty bridges to PennDOT, all of which have met

specifications and some of which were still in place at the time this complaint was filed. (*Id.* ¶¶ 22-25.)

In December of 2009, Mabey submitted a quote to a contractor to supply a temporary bridge for a PennDOT project. (*Id.* ¶ 33.) The contractor was awarded the bid from PennDOT and ordered the bridge components from Mabey. (*Id.* ¶¶ 34, 35, 37.) Despite PennDOT having previously approved the use of the Mabey bridge, on April 29, 2010, the contractor received notice from PennDOT that the bridge could no longer be used because it was made from foreign steel. (*Id.* ¶ 38.)

On May 27, 2010, a general letter was sent out by PennDOT's Chief Bridge Engineer giving notice to all district engineers that foreign steel was no longer to be accepted in bids for temporary bridges. (*Id.* ¶ 39.) The letter also indicated a "special provision" was to be added to all PennDOT projects regarding the use of foreign steel. (*Id.* ¶¶ 42, 43.)

Because of this new PennDOT policy, Mabey claims it has been forced to cancel four contracts for PennDOT projects and prevented from bidding on several others. (*Id.* ¶¶ 51, 52.)

### C. <u>Procedural History</u>

On July 16, 2010, Plaintiff filed the instant complaint. (Doc. 1.) Defendant filed an answer with affirmative defenses on September 9, 2010, (Doc. 7), and subsequently a motion for summary judgment on September 22, 2010, (Doc. 11). On October 26, 2010, Plaintiff filed a brief in opposition, (Doc. 20), and Defendant replied on November 12, 2010, (Doc. 26). The motion is now ripe for disposition.

## II.        <u>Legal Standard</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

**III.        Discussion**

Plaintiff has brought claims under the following provisions of the United States Constitution — the Supremacy Clause, art. VI, cl. 2; the Commerce Clause, art. I, § 8, cl. 3; the Contracts Clause, art. I, § 10; the Equal Protection Clause of the Fourteenth Amendment; and the Due Process Clause of the Fourteenth Amendment. (Compl. Counts I – V.) Defendant counters that the Steel Act is not only Constitutional, but also authorized by the BAA. The court will address each claim individually.

**A.        Federal Preemption**

Plaintiff argues that the Steel Act violates the Supremacy Clause of the United States Constitution because it is preempted by the BAA. Defendant counters that the BAA specifically authorizes states to enact more stringent standards then those required under the BAA and is thus, not preempted. The court agrees that the BAA specifically authorizes states to enact more restrictive standards for steel then required by the BAA and, therefore, the Steel Act is not preempted.

The doctrine of federal preemption stems from Article VI, Section 1, Clause II, of the United States Constitution, which states that the "Law of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall

be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI, cl. 2. It is well established that Federal law may preempt state law in one of three ways: express preemption, field preemption, or implied preemption. *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009). The courts analysis is guided "by the rule that the purpose of Congress is the ultimate touchstone in every preemption case." *Id.* In addition, a court must always begin with "a presumption against preemption." *Id.*; *see Farina v. Nokia Inc.,* 625 F.3d 97, 116 (3d Cir. 2010). "In areas of state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." *Holk*, 575 F.3d at 334 (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005).) Put another way, "if confronted with two plausible interpretations of a statute, [a court has] a duty to accept the reading that disfavors pre-emption." *Id.* (citing *Bates, supra* (internal quotations omitted).)

As stated above, the BAA provides that,

> **(a)** Notwithstanding any other provision of law, the Secretary of Transportation shall not obligate any funds authorized to be appropriated to carry out the Surface Transportation Assistance Act of 1982 (96 Stat. 2097) or this title and administered by the Department of Transportation, unless steel, iron, and manufactured products used in such project are produced in the United States.
> . . .

> **(d)** The Secretary of Transportation shall not impose any limitation or condition on assistance provided under the Surface Transportation Assistance Act of 1982 (96 Stat. 2097) or this title that *restricts any State from imposing more stringent requirements than this section on the use of articles, materials, and supplies mined, produced, or manufactured in foreign countries in projects carried out with such assistance* or restricts any recipient of such assistance from complying with such State imposed requirements.

23 U.S.C. § 313 (emphasis added).

Far from conveying an express "clear and manifest" intent to restrict states from legislating in this field, Congress has instead explicitly authorized states to enact laws with requirements more stringent than those found in the BAA. Furthermore, the FHWA specifically allows states to have more stringent restrictions, as long as they are authorized by statute and do not establish in-state preferences. *FHWA, Off. of Infrastructure, Off. of Program Admin., Contract Admin. Grp. (HIPA-30), Contract Admin. Core Curriculum Participant's Manual and Reference Guide 2006, Pl.'s Ex. 13.)* ("States may have "Buy America" provisions that are more restrictive than the Federal requirements . . . . However, the more restrictive provisions must be authorized by State law. . . . The State law or policy may not establish an in-State materials preference.") Finally, federal regulations also state that no federal highway project is to proceed unless "[t]he State has standard contract provisions that require the use of domestic materials and products, including steel and iron materials, to the same or greater extent as the provisions set forth in this section." 23 C.F.R. § 635.410.

Given this clear language, the court finds it hard to conclude that the "purpose of Congress" was a "clear and manifest" intent to preclude states from enacting requirements more stringent then those requires by the BAA. *See Holk,* 575 F.3d at 334. Furthermore, the court fails to see in what other regard a state could be more restrictive. The statute is clear that states may not impose state specific steel requirements. And based on the briefing before the court and the relevant case law, it seems apparent states could not mandate or prohibit steel from being purchased in a specific country without violating the power of the Federal government to occupy

the field of foreign affairs.  *See Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38, 49 (3d Cir. 1999).

The court recognizes that the federal regulations which seek to clarify the BAA are far from straightforward and often reference back to the policies and procedures established by the FHWA, which are found in various administrative documents spanning the years since the enactment of the BAA.  *See* 23 C.F.R. 635.409; 23 C.F.R. 635.410.  Regardless, however confusing the internal cross-references are between the BAA, the regulations, and the policies and practices of the FHWA, each one allows states to be more stringent then the BAA, even if the FHWA itself has taken a more general policy of excluding temporary steel from needing to be domestically produced.  *See* BAA, 23 U.S.C. § 313; 23 C.F.R. § 635.409 (1)(b) (stating that a state may not be more restrictive or discriminatory then is otherwise allowed by the Department of Transportation as prescribed by the FHWA); 23 C.F.R. § 635.410 (allowing funding authorization if the state has standard contract provisions in place that require more stringent requirements then those set forth by the regulations); *FHWA, Off. of Infrastructure, Off. of Program Admin., Contract Admin. Grp. (HIPA-30), Contract Admin. Core Curriculum Participant's Manual and Reference Guide 2006, Pl.'s Ex. 13.)* (allowing states to have more stringent requirements if proscribed by state law).

Thus, it seems clear that Congress professed no intention to exclude the states from regulating in the field of steel used in highway construction projects, and instead, granted states the explicit ability to enact laws more stringent then those required by the BAA or regulations promulgated thereunder, along with the policies and practices of the FHWA.  Therefore, the fact that Pennsylvania law requires that

temporary bridges be made from domestically produced steel, does not run contrary to the more general requirement that such temporary materials are exempt under the BAA. As such, Plaintiff's federal preemption claim fails.

## B.    <u>Dormant Commerce Clause</u>

Count II of Plaintiff's complaint alleges that the Steel Act violates the dormant Commerce Clause of the United States Constitution. Defendant rebuts this claim arguing that PennDOT is acting as a market participant, not a market regulator, and also that Congress has specifically authorized the states to regulate steel in the field of federally funded highway projects through the BAA and subsequent regulations, and thus, no dormant Commerce Clause violation exists. The court will address Defendant's arguments in reverse order.

The Commerce Clause states as follows: "Congress shall have power to . . . regulate commerce with foreign nations, and among the several states . . . ." U.S. CONST., art. I, § 8, cl. 3. This Clause is also said to have a negative aspect referred to as the "dormant commerce clause" which "prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-states interests' expense . . . ." *Cloverland -Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002). Put in a different manner, "a state cannot impede free market forces to shield in-state businesses from out-of-state competition." *Id.* However, "Congress can authorize states to impose restrictions that the dormant Commerce Clause would otherwise forbid." *Id.* at n. 13.

When an allegation is brought that a state statute violates the dormant Commerce Clause, the court must make a two part analysis. First, it must be determined if the state law "discriminates against interstate commerce 'on its face or

13

in practical effect.'" *Id.* (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986).) If so, heightened scrutiny applies and a state must show it has no other means to further a legitimate local interest. *Id.* at 211.

If the statute does not on-its-face violate the dormant Commerce Clause, but only " 'incidentally' burdens it, the regulation will be upheld unless the burden is 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).)

In the instant case, it is clear that he Steel Act does not violate the dormant Commerce Clause. Nothing in the language of the Steel Act works to discriminate against interstate commerce, neither on its face or in practical effect. *See Cloverland- Green, supra*. The Steel Act was passed in an effort to "promote the general welfare and stimulate the economies of both Pennsylvania and the United States." 73 Pa. Cons. Stat. § 1883. Although the state of Pennsylvania is mentioned in the preamble, nothing in the text of the statute works to exclude steel from another domestic origin. As such, the statute does not violate the dormant Commerce Clause.

In addition to a violation of a domestic dormant Commerce Clause, Plaintiff also argues that the Steel Act violates the foreign Commerce Clause. In the context of foreign commerce, courts have generally acknowledged that there is a need for national uniformity. *See Wardair Can., Inc. v. Fl. Dep't of Revenue*, 477 U.S. 1, 8 (1986). "As in the context of cases alleging violations of the dormant Interstate Commerce Clause, the concern in these Foreign Commerce Clause cases is not with an actual conflict between state and federal law, but rather with the policy of

uniformity, embodied in the Commerce Clause, which presumptively prevails when the Federal Government has remained silent." *Id.*

Here, the Federal Government has not remained silent on the issue of whether a state may discriminate against foreign companies in the purchase of steel products used for federally funded highway projects. Instead, the BAA has created a "floor," which it specifically authorizes the states to rise above in creating more stringent state standards for the purchase of steel products. Thus, no actual conflict exists between state and federal law. Instead, federal law creates the minimal requirements which a state must abide by, and then specifically allows a state to create more stringent standards within its own territory. Plaintiff has thus failed to demonstrate that the Steel Act violates the Foreign Commerce Clause of the United States Constitution and the claim is denied.

## C. Contract Clause

Plaintiff also brings claims under Article 1, Section 10, of the United States Constitution, referred to as the "Contracts Clause." Defendant counters that this claim fails because there has been no new law passed and because a Contracts Clause claim cannot be brought against an executive agency.

Article I, § 10, of the Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Initially a court must ask, "whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'" *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978).) "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."

*Id.* When the challenged contract is between private parties, "the court will defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued." *Transport Workers of Am., Local 290 By and Through Fabio v. Se. Pa. Transp. Auth.*, 145 F.3d 619, 622 (3d Cir. 1998).

Here, Plaintiff has failed to show a "change in law" that has substantially impaired its contractual relationships. The Steel Act has been in place since 1978, and the only "change" to the law has been the manner in which PennDOT has chosen to interpret the law- essentially, by declining to read an exception into the law for temporary steel structures. To the extent that Plaintiff is challenging this interpretation by an administrative agency, the claim must be denied, as the Contracts Clause only applies to actions by the state legislature, not administrative agencies. *Stockham Interests, LLC v. Borough of Morrisville*, 2008 WL 4889023, at *9 (E.D. Pa. 2008) (explaining, "the contracts clause applies only to legislative acts . . ."). As such, Plaintiff's Contract Clause claim fails as a matter of law.

### D.    Equal Protection

Plaintiff also claims that the distinction made between temporary bridges and other temporary construction items, is not rationally related to a legitimate government interest and, thus, violates the Equal Protection Clause of the Fourteenth Amendment. Defendant counters that the Legislature has determined that protection of domestic steel is a legitimate government purpose and that any discriminatory impact is not unconstitutional.

16

Generally, "economic and social legislation is subject to rational basis review, under which a law need only be 'rationally related to a legitimate state interest.'" *Tolchin v. Supreme Court of the State of NJ*, 111 F.3d 1099, 1114 (3d Cir. 1997) (quoting *Schumacher v. Nix*, 965 F.2d 1263 (3d Cir. 1992).)

Plaintiff argues that PennDOT's discrimination against temporary bridges, as opposed to other temporary steel items (i.e. tools, trailers, cranes), is not rationally related to any legitimate government interest. The Third Circuit has already addressed an equal protection challenge to the Steel Act in *Trojan Technologies v. Commonwealth of Pa.*, 916 F.2d 903 (3d Cir. 1990), holding "'the Equal Protection Clause permits economic regulation that distinguishes between groups that *are* legitimately different — as local institutions so often are,' . . . we find no basis for concluding that the Steel Act contravenes the equal protection clause." *Id.* at 916. Plaintiff attempts to distinguish *Trojan Technologies* by not complaining of discrimination between domestic and foreign steel, but rather between temporary steel bridges and other temporary steel items. The court fails to see how this distinction would make a difference in the outcome of this case. The state of Pennsylvania has chosen to include temporary bridges in the requirements of the Steel Act, and has made a separate exclusion for other construction "tools."[3] Although PennDOT's regulations may not be a picture of clarity on what is and is not allowed in highway construction projects, it has made clear that temporary bridges, as opposed to other temporary tools, will not be excluded from the Steel

---

[3] Publication 408/2007-6 governing construction specifications, effective April 2, 2010, provides, "[i]f steel products are used as a construction tool and will not serve a permanent functional use in the project, compliance [with the Steel Act] is not required." PennDOT, Specifications, Publication 408/2007-6, Section 106.1 General, Pl.'s Ex. 9).

Act.  The General Assembly has determined that protection of the domestic steel industry, including the makers of temporary, domestically-produced steel bridges, serves a legitimate local purpose and, therefore, has been upheld by the Third Circuit.  Thus, no equal protection challenges exists here, and the claim will be denied.

### E.    Substantive Due Process

Plaintiff's final claim alleges that the Steel Act violates the substantive Due Process Clause of the Fourteenth Amendment.  Defendant counters that substantive due process challenges can only be brought where there was a deprivation of real property, and that deprivation rises to such a level as to "shock the conscience."

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV.  To prevail on an allegation that a party was deprived of a property interest due to a non-legislative act, a plaintiff must first establish that "he has a protected interest to which the Fourteenth Amendment's due process protection applies."  *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 140-41 (3d Cir. 2000) (quoting *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118 (3d Cir. 2000).)  The Supreme Court has cautioned, and the Third Circuit has heeded, that considering a substantive due process claim requires "caution and restraint."  *Id.* (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring).)  Although the Third Circuit has been clear that substantive Due Process applies to certain fundamental rights, like real property, the Circuit has been reluctant to extend this concept further.  *Id.* at 141 (compiling cases and declining to extend

18

substantive due process to an employment contract); *see Ransom v. Marrazzo,* 848

F.2d 398 (3d Cir. 1988) (declining to extend substantive due process to water or

sewer services). In sum, a court

> must look, as a threshold matter, to whether the property
> interest being deprived is "fundamental" under the
> Constitution. If it is, then substantive due process protects
> the plaintiff from arbitrary or irrational deprivation,
> regardless of the adequacy of procedures used. If the
> interest is not "fundamental," however, the governmental
> action is entirely outside the ambit of substantive process
> and will be upheld . . .

*Id.* at 142. Furthermore, "[i]t is well settled that there can be no property interest in

obtaining future government contracts and that suspension or debarment from

bidding on such contracts only implicates a liberty interest if it is based upon charges

of fraud or dishonesty." *Leer Elec., Inc. v. Pa. Dep't of Labor and Industry*, 597 F.

Supp. 2d 470, 479 (M.D. Pa. 2009) (quoting *Labalokie v. Capital Area Intermediate

Unit*, 926 F. Supp. 503, 508 (M.D. Pa. 1996).)

Although the court is mindful that PennDOT's recent interpretation of

the Steel Act creates confusion and frustration with those companies that provide

temporary , foreign-produced, steel bridges for highway construction, this court is

not willing to determine that the building of temporary steel bridges using only

domestic steel is a "fundamental right" under the United States Constitution and,

thus, subject to substantive due process analysis. Furthermore, there is no indication

in the record before the court the PennDOT acted with fraud or dishonesty when

reinterpreting the Steel Act's temporary bridge provisions. There is no fundamental

right at issue that would invoke the United States Constitutional substantive Due

Process provisions. As such , this claim will be denied.

## IV.         <u>Conclusion</u>

      For the aforementioned reasons, Plaintiff has failed to show there is a genuine issue of material fact with regard to the Constitutional violations which are alleged in the complaint.  As such, Plaintiff's Supremacy Clause, Commerce Clause, Contracts Clause, Equal Protection Clause and Due Process clause claims will be dismissed.  An appropriate order to follow.

   s/Sylvia H. Rambo
United States District Judge

Dated:  January 12, 2011.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MABEY BRIDGE & SHORE, INC.,** | : | |
| **Plaintiff** | : | **No. 1:10-CV-1474** |
| **v.** | : | **Judge Rambo** |
| **ALLEN D. BIEHLER, Secretary** <br> **of Transportation of the** <br> **Commonwealth of Pennsylvania,** | : | |
| **Defendant** | : | |

## O R D E R


For the reasons mentioned in the accompanying memorandum of law, it is **HEREBY ORDERED**, Defendant's motion for summary judgment, (Doc. 11), is **GRANTED**. The clerk of court is directed to enter judgment in favor of Defendant and against Plaintiff and close the case.


       s/Sylvia H. Rambo
       United States District Judge

Dated: January 12, 2011.